U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described.**



Signed January 21, 2009                    United States Bankruptcy Judge

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| COYOTE RANCH CONTRACTORS, LLC, | § | CASE NO. 07-32363-SGJ-7 |
| | § | |
| D E B T O R. | § | |
| | § | |

## MEMORANDUM OPINION AND ORDER REGARDING CHAPTER 7 TRUSTEE'S APPLICATION FOR ALLOWANCE OF COMPENSATION

CAME ON FOR CONSIDERATION before this court the Application of the Chapter 7 Trustee for Allowance of Fees and Reimbursement of Expenses ("Application") and the objection thereto ("Objection") of the largest creditor in the case, Simpson Cherry Creek Limited Partnership ("Simpson"). This matter requires the court to interpret certain changes made to Section 330 of the Bankruptcy Code ("Code"), by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA")—specifically changes to Sections 330(a)(3) and newly added Section 330(a)(7). The

1

court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). The court reserves the right to supplement or amend these findings of fact and conclusions of law. Where appropriate, a finding of fact shall be construed as a conclusion of law, and *vice versa*.

**<u>FINDINGS OF FACT</u>**

**A. Background of the Case.**

The relevant facts are that Coyote Ranch Contractors, LLC (the "Debtor" or "Coyote Ranch") filed a Chapter 7 case on May 21, 2007. Daniel J. Sherman (a bankruptcy lawyer with approximately 29 years of experience in this district) was promptly appointed as the Chapter 7 Trustee. The Debtor was formerly a contractor in connection with the construction of a 507-unit apartment complex in Arapahoe County, Colorado that Simpson now owns (the "Property"). Simpson alleges that construction defects plague the Property and asserts damages against the Debtor relating thereto of almost $28 million. This makes Simpson, by far, the largest creditor of the Coyote Ranch bankruptcy estate (albeit, with an unliquidated claim).[1]

Prior to the bankruptcy filing, the Debtor, Simpson, dozens

---

[1] The claims register in this case reflects that seven proofs of claim were filed, including two proofs of claim by Simpson. The seven claims aggregate $28,233,934.61, meaning Simpson holds 96% of the total filed claims.

of subcontractors, and certain insurance carriers were in
contentious litigation, concerning the alleged construction
defects, and who might be liable to whom for what.  A lawsuit had
been pending in the state of Colorado ("Colorado Lawsuit")[2] for
approximately three-and-a-half years that was stayed by the
filing of the Coyote Ranch bankruptcy case.  The Colorado Lawsuit
was complex.  There were over 40 parties in the lawsuit.  Among
the many issues were:  (a) questions regarding whether the Debtor
had access to insurance coverage and how much; (b) issues
concerning whether there were construction defects versus design
defects with regard to the Property; (c) there were wildly
differing views among the parties about the level of potential
damages, among other reasons, because of questions under Colorado
law whether Simpson's damages might be limited to the lesser of
actual damages versus diminution in value of the Property (the
evidence being that, despite the alleged damages of almost $30
million, the Property had cost approximately $30 million to
build, and had a 95% occupancy rate—casting some doubt on the
notion of diminution in value); and (d) assuming Simpson was
entitled to damages for construction defects, there were (as
previously mentioned) dozens of subcontractors whose work was
implicated and among whom the damages might be allocated.  The
evidence was that, in the history of the Colorado Lawsuit prior

---

[2] There were actually three consolidated lawsuits.

to the bankruptcy filing, there had been over 1,000 pleadings filed, dozens of experts retained, over 100 depositions taken, seven days of mediation (usually divided into flights—for example, mediation with plumbing subcontractors one day and other types of subcontractors another day) and yet, after three-and-a-half years of litigation, still very little had been settled prior to the bankruptcy filing by Coyote Ranch (specifically, out of more than 40 parties, there had been between four and six settlements reached prepetition, resulting in "over $1 million" of settlement proceeds, according to the testimony of Simpson's counsel).

The timing of the bankruptcy filing was unfortunate, in the opinion of plaintiff-Simpson, because a trial in the Colorado Lawsuit (which had been continued on previous occasions) was scheduled for a full week in August 2007. Moreover, 45 depositions had been carefully scheduled throughout the summer, and various dispositive motions were set for hearing prior to the August trial. Severance of the Debtor was apparently not a viable option for the Colorado Lawsuit (in order to go forward effectively against subcontractors and the insurance carriers).[3] Simpson, therefore, filed a 40+ page motion to lift stay with attachments, just eight days after the bankruptcy case was filed,

---

[3] The testimony was that Simpson had not directly sued the subcontractors, although Colorado law permitted that.

on May 29, 2007 [DE # 13], which it asked to be set on an
expedited basis (the hearing was held on June 11, 2007).  Simpson
also filed a 40+ page (with attachments) motion to dismiss on May
31, 2007 [DE #20], arguing that the bankruptcy filing was made in
bad faith, which it moved to have set for hearing in the ordinary
course of the court's business.[4]  Simpson's motion to lift stay
resulted in two orders [DE #37 and DE #57]—which the newly-
involved Trustee agreed to—modifying the stay, in part, to permit
the Colorado court to adjudicate certain dispositive motions (but
not to go forward with the August 2007 trial), but more
significantly, *requiring all the parties to the Colorado Lawsuit
to mediate in Dallas, Texas in August 2007, before two mediators
selected by the parties*.  The court notes, anecdotally, that it
had serious reservations about its jurisdiction to order an "all-
hands" mediation, when parties had not filed proofs of claim in
the bankruptcy case yet (and when some of the claims in the
litigation involved claims of third parties against non-debtor
parties), but Simpson and the Trustee advocated for this
approach, and the court thought that the complications of the
bankruptcy filing might create the perfect crucible to forge
settlements through a "mega-mediation."

---

[4] The motion to dismiss was withdrawn by Simpson prior to
its scheduled hearing [DE # 63].

5

**B. The Mega-Mediation and Subsequent Negotiations and Settlements.**

After the stay modification orders, the "mega-mediation," indeed, took place in Dallas, Texas, in August 2007. The mediation lasted three-and-one-half days (three of the days going into the night-time hours), and most parties to the Colorado Lawsuit participated, along with the Chapter 7 Trustee. Several settlements were accomplished in connection with that mega-mediation. Over the fall of 2007, more negotiations occurred involving both the Trustee and Simpson's counsel and others, settlement documents were prepared (and presented by the Trustee to the Bankruptcy Court for approval) and there were attempts to achieve further settlements. Further settlements were, indeed, reached. Finally there was still more mediation in Denver, Colorado on December 19, 2007, at which the Trustee and his counsel participated. Yet more settlements were reached. The end result is that $10,588,770.29 of monies were received into the bankruptcy estate, in just a few months, from insurance policies and from certain subcontractors (most of which funds have now been disbursed to Simpson and other claimants; the Trustee now holds a reserve of $1,746,448.38 pending resolution of his Application and certain other administrative matters). Numerous claims have been released against the estate, and only

the Simpson claim and a few others remain against the estate.[5]

## C.  The Trustee's Requested Compensation.

As the administration of the estate has virtually concluded, the Trustee now pursues his Application.  The Trustee is requesting $340,913.11 in fees and $4,603.12 in expenses, for a total of $345,516.23 as his total compensation in the case.  This is computed by strictly applying the commission structure set forth for trustees in Section 326(a) of the Code to the $10,588,770.29 sum of monies that have been received, and will be fully disbursed, by the Trustee (*i.e.,* 25% of the first $5,000; 10% of amounts between $5,000 and $50,000; 5% on amounts between $50,000 and $1,000,000; 3% for amounts over $1,000,000).  The Trustee has provided "backup" time and expense records to the court, showing that the combined time expended on the Coyote Ranch case by the Trustee and other professionals in his office was 461.7 hours, during a 16-and-one-half-month period (and, if the Trustee and his office professionals charged their usual customary rates for this 461.7 hours of time, the fees would be $174,420 using a "lodestar" approach).  The Trustee argues that

---

[5] The evidence did not reflect the percentage dividend to unsecured creditors in this case (obviously the exact percentage depends, to some extent, on the Trustee's commission ultimately allowed herein) but, given that approximately $28 million of claims were filed, and there will be nearly $10 million to distribute (give or take—depending on the exact amount of administrative claims allowed), simple math reflects that the dividend to unsecured creditors in this case will be more than 33%.

7

approximately $77,000 of this $174,420 worth of incurred time was attributable to attorney's duties (versus actual trustee's duties) and could be separately sought as attorney compensation and, thus, the estate is arguably being offered a $77,000 discount, by the Trustee having foregone the opportunity to apply for this.[6]

Simpson has objected to the Application. Simpson argues that the requested compensation is excessive, unreasonable, disproportionate and unjustified under the traditional "lodestar" analysis and other measures for determining reasonable compensation for bankruptcy trustees. Simpson argues that the Trustee's activities in this case consisted exclusively of the assertion of the Debtor's claims pertaining to insurance coverage (and analysis of alter ego claims against an affiliated entity that actually possessed coverage), claims involving subcontractors, and resolution of all these claims. Simpson argues that the recoveries realized in this case (*i.e.,* the $10,588,770.29 pot of funds, as well as the compromises achieved relating to the Colorado Lawsuit) were the result of a number of

---

[6] The Trustee, who is an attorney, obtained court authority to employ himself in this case. *See* 11 U.S.C. § 328(b). Note also that the Trustee's Application was submitted in October 2008, but the hearing on it was continued (by motion of the parties) and not ultimately heard until January 2009. The Trustee has testified that he has incurred additional time on this case (above the 461.7 documented to the court), since October 2008.

parties and professionals, including significant efforts by Simpson's counsel (who had been lead Plaintiff's counsel for over three years), and the Trustee did not show any extraordinary efforts or talents in accomplishing the settlements in the case. In essence, Simpson argues that the Trustee "piggy backed" onto Simpson's counsel's work product and efforts and is now asking for a "bonus."[7]  There was also an argument that the Trustee may have insisted that insurance proceeds flow through the estate (so the Trustee could argue entitlement to a commission thereon), when this did not necessarily need to happen (according to Simpson, the money could have been paid directly to Simpson or endorsed over to it).

**D.  Examining What the Trustee Actually Did.**

It is clear (from both the time records submitted, as well as the testimony of the Trustee—both of which the court finds credible) that the Trustee in this case quickly sprang into action once the case was filed.

The Trustee spent significant time on the phone the day after the case was filed, with Debtor's counsel, an attorney for a subcontractor, and various others, getting up to speed

---

[7] Simpson notes, in making its "bonus" argument, that if one divides the $340,913.11 statutory commission sought by the Trustee by the 461.7 hours of time the Trustee incurred in this case, the result is a very large lodestar factor ($738.39 per hour–significantly more than the Trustee's usual rate of $400 per hour).

regarding the Debtor and its litigation. Additional lengthy phone conferences transpired in the following days with Simpson and others. The Trustee soon met with Simpson's counsel and began undertaking more due diligence on the Colorado litigation. Among other things, there was an alter ego claim against an affiliate of the Debtor that, not only would the Trustee (not Simpson or other litigants) own/control thereafter, but the alter ego target appeared to be the company with the insurance coverage that might be tapped to address the damages claims that proved valid.

In addition to understanding the alter ego claim, the Trustee had a significant analysis to undertake to understand the insurance coverage ambiguities (a declaratory judgment action had been pending in a Dallas court, prepetition, in which the insurer was seeking a determination that there was no coverage); the Trustee ultimately retained insurance counsel to interpret the issues for him.

Simpson's counsel was eager to quickly move forward with the Colorado Lawsuit (having filed its emergency motion to lift stay almost immediately after the case was filed) and seemed adamant on trying to turn the bankruptcy filing into an advantage. The idea of going forward with a mega-mediation in August 2007 (during the week that trial had long been scheduled) was discussed and pursued. The Trustee and his counsel prepared for

the mega-mediation by reading memoranda and other trial preparation materials provided by Simpson. The Trustee and his counsel saw no purpose in "reinventing the wheel" by reading every expert report or other documentation pertaining to damages (in the court's view, a very reasonable course of action; had the Trustee and his counsel "reinvented the wheel," in this regard, the Trustee's insurance counsel's fees would, no doubt, have been much higher than they were).[8]

As earlier mentioned, the mega-mediation went on for three-and-one-half days, with the Trustee participating the entire time. The Trustee ultimately achieved approximately $2,000,000 worth of settlements from various subcontractors (about $1.3 million of which was accomplished during the August mega-mediation), with the bulk of the settlement funds (approximately $8,500,000) coming from the insurance carrier for the alleged alter ego/affiliate of the Debtor. The Trustee testified credibly that it was important to accomplish the early settlements with these various subcontractors in August, because this gave the estate a "war chest" to credibly threaten the alter ego suit that would be the key to tapping into the potential insurance coverage. The estate only had $15,000 of cash when the case was filed, receiving another $40,000 a short time later. A

---

[8] The Trustee's insurance counsel's fees and expenses in this case that the court has approved are $135,942.61 [DE #195 and DE #223].

cash-poor estate, with lawyers working essentially on a contingency, would not have been a formidable threat to the insurance carriers involved.

The Trustee testified knowledgeably about each and every subcontractor he settled with (and his involvement versus the role of Simpson).  Soon after the initial settlements with some of the subcontractors, the discussions with the insurance carriers turned serious, and the $8.5 million settlement was ultimately achieved.  Simpson was not happy with this settlement; it believed that something closer to $20 million was more appropriate.  But Simpson did not object to this or any other settlement that the Trustee proposed and had approved pursuant to Bankruptcy Rule 9019 in the case.

As earlier alluded to, Simpson has argued that it was questionable, if not outright improper, that the Trustee took into the estate the approximately $8.5 million settlement from the insurance company.  The insured on the policies involved was an affiliate of the Debtor (Northwest Construction Company, Inc.; hereinafter "Northwest") and not the Debtor, and, thus, Simpson argues, the policies were not "property of the estate." Moreover, Simpson was the allegedly injured party, holding 96% of the filed claims against the estate, and the insurance ***proceeds*** might be argued to have been ***its*** property that could have simply been paid directly to it by the insurance carrier(s).  Simpson

12

believes the situation (of having the $8.5 million flow through the estate) was contrived by the Trustee to increase his commission. However, the explanations by the Trustee for the funds-flow are at least two fold. First, the Debtor had a viable claim that Northwest (the insured) was the Debtor's alter ego (and, thus, the corporate veil between Debtor and Northwest could be collapsed, making the Debtor one-and-the-same as the one insured). Second, the Trustee was being required, in connection with the settlement, to give a release of claims against the insurance carriers, relating to a myriad of potential claims, and he would not give a release without getting some consideration for same.

## CONCLUSIONS OF LAW

**A.  Applicable Statutory Authority.**

The starting place for ruling on the Application is Section 326 of the Code, entitled "Limitation on compensation of trustee." It provides that in:

> a case under chapter 7 or 11, the court may allow reasonable compensation under section 330 of [the Code] of the trustee for the trustee's services, payable after the trustee renders such services, not to exceed 25 percent on the first $5,000 of less, 10 percent on any amount in excess of $5,000 but not in excess of $50,000, 5 percent on any amount in excess of $50,000 but not in excess of $1,000,000, and reasonable compensation not to exceed 3 percent of such moneys in excess of $1,000,000, upon all moneys disbursed  or turned over in the case by the trustee to parties in interest . . ..

11 U.S.C. § 326(a).

Section 330, which is referenced in Section 326(a), and is entitled "Compensation of officers," is additional statutory authority relevant to the Application.  At subsection (a)(1), it generally provides that, after notice to parties in interest and a hearing, and subject to sections 326, 328 (not applicable here) and 329 (not applicable here), the court may award a trustee, among other officers in a case, "reasonable compensation for actual, necessary services rendered by the trustee" and "reimbursement for actual, necessary expenses."  11 U.S.C. § 330(a)(1)(A), (B).  At subsection (a)(2), Section 330 further generally provides that, "The court may, on its own motion or on motion of . . . any . . . party in interest, award compensation that is less than the amount of compensation that is requested."

Before BAPCPA, subsections (a)(3) and (a)(4) of Section 330 were the final, relevant authority with regard to a trustee's compensation.  Subsection (a)(3) formerly provided:

> In determining the amount of reasonable compensation to be awarded, the court *shall* consider the nature, the extent, and the value of such services, taking into account all the relevant factors, including (A) the time spent on such services; (B) the rates charged for such services; (C) whether the services were necessary to the administration, or beneficial at the time at which the service was rendered toward the completion of, a case under this title; (D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the

14

> > problem, issue or task addressed; and (E)
> > whether the compensation is reasonable based
> > on the customary compensation charged by
> > comparably skilled practitioners in cases
> > other than cases under this title.

11 U.S.C. § 330(a)(3) (emphasis added). Subsection (a)(4)

provided (and still provides, post-BAPCPA):

> the court shall not allow compensation for -

> > (i) unnecessary duplication of services; or

> > (ii) services that were not -

> > > (I) reasonably likely to benefit the
> > > debtor's estate; or

> > > (II) necessary to the administration of
> > > the case.

11 U.S.C. § 330(a)(4).

Post-BAPCPA, the landscape is slightly different with regard

to trustee compensation. Specifically, subsection (a)(3) of

Section 330—setting forth the laundry list of *Johnson*-type[9]

---

[9] *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714,
717-719 (5th Cir. 1974). In *Johnson*, the Fifth Circuit stated
that in awarding a reasonable fee, the following factors should
be considered: (1) time and labor involved; (2) novelty and
difficulty of the questions; (3) skill requisite to perform the
legal services properly; (4) the preclusion of other employment
due to acceptance of the case; (5) customary fees in similar
cases in the community; (6) the contingent versus fixed nature of
the fee; (7) time limitation imposed by the client or
circumstances; (8) the amount involved and the results obtained;
(9) the experience, reputation and ability of the attorney(s);
(10) the undesirability of the case; (11) the nature and length
of the professional relationship with the client; and (12) awards
in similar cases, within or without the circuit. Note that many
(but not all) of these factors are set forth in Section
330(a)(3)—thus, this court loosely refers to the factors set
forth in Section 330(a)(3) as "*Johnson*-type" factors.

factors that "shall" be taken "into account" in "determining the reasonableness of compensation to be awarded" was amended to apply only to an "examiner, **trustee under chapter 11**, or professional person" (emphasis added).  Moreover, subsection (a)(7) was newly added, and it provides that:

> In determining the amount of reasonable compensation to be awarded to a trustee,[10] the court shall treat such compensation as a commission, based on section 326.

11 U.S.C. § 330(a)(7).

Herein lies the rub.  What do the combined:  (a) omission of chapter 7 trustees from subsection (a)(3) of Section 330; and (b) addition of subsection (a)(7) of Section 330 accomplish? Presumably, before BAPCPA, trustees generally (both in chapter 7 and 11) were entitled to "reasonable" compensation in cases—with there being a ceiling on such compensation in the amount of the statutory percentages set forth in Section 326(a)—and in determining reasonableness, one considered the *Johnson*-type factors set forth in Section 330(a)(3).  But what now?  Does the omission of "chapter 7 trustees" in subsection (a)(3) mean that courts should not consider these *Johnson*-type factors in determining reasonableness of a chapter 7 trustee's compensation? Was the omission of chapter 7 trustees from subsection (a)(3), combined with new subsection (a)(7), intended to perhaps create a

---

[10] Note that Section 330(a)(7) refers to "a trustee"—not distinguishing between chapter 7 and chapter 11 trustees.

definition for what should be considered "reasonable" (*i.e.,* the statutory commission set forth in Section 326 is now deemed "reasonable")? Or, is the statutory commission now a starting place or a "baseline," of sorts, for what should be considered "reasonable," and the statutory commission is still subject to a "reasonableness" inquiry when there is an objection? (And, if so, what factors should the court consider in a "reasonableness" inquiry, since chapter 7 trustees are now deleted from subsection (a)(3)?) Finally, was Section 330(a)(7) just surplusage—has nothing really changed under BAPCPA?

Few courts have addressed this issue to date. Those courts that have are inconsistent in their approaches, with most still continuing to engage in a "reasonableness" inquiry that reverts to the traditional *Johnson*-type analysis. *See In re Owens,* 2008 WL 4224530 (Bankr. D. Or. Sept. 15, 2008) (in a case filed October 12, 2005—pre-BAPCPA—the court retroactively applied section 330(a)(7) in determining a trustee's commission, and stated that the new language "does no more than clarify Congress's understanding of Section 326"; the court went on to refer to the Section 326 commission as "presumptive," yet susceptible to reduction, if the commission "is substantially disproportionate to the value of the trustee's services" or "excessive," and reduced the Section 326 commission, based on the equities, in order to give unsecured creditors a dividend); *In*

17

*re Phillips*, 392 B.R. 378 (Bankr. N.D. Ill. 2008) (court, in declining to award a Chapter 7 trustee the full Section 326 commission, held that the commission, pursuant to Section 330(a)(7), is not presumptive, and it should only be awarded to a trustee for truly excellent work, and a lesser amount should be awarded for very good, or average, or less-than-average work; the court noted that of the twelve *Johnson* factors, only six are set forth in Section 330(a)(3), and while these six factors, post-BAPCPA, could no longer be considered with regard to a chapter 7 trustee, the **other** six *Johnson* factors could, in the court's discretion, be considered); *In re McKinney*, 383 B.R. 490 (Bankr. N.D. Cal. 2008) (court held that Section 330(a)(7) creates a presumption that the maximum commission under Section 326(a) is reasonable, but it can be rebutted and the commission reduced, if time records and other circumstances suggest that the commission is disproportionate to the value of the trustee's services); *In re Mack Props., Inc.,* 381 B.R. 793 (Bankr. M.D. Fla. 2007) (while noting both the new language at Section 330(a)(7) and that chapter 7 trustees are no longer subject to Section 330(a)(3), court nevertheless held that "Congress did not alter the Code provisions containing the 'reasonableness' standard for compensation determination. The plain and unambiguous language of Section 326 and 330 require a Chapter 7 trustee's compensation to be held to a reasonableness standard"; court reduced the

Section 326 commission by more than half); *In re Clemens*, 349
B.R. 725, 730 n.20 (Bankr. D. Utah 2006) ("Although chapter 7
Trustees are no longer subject to the statutory considerations
under § 330(a)(3), they are still subject to the reasonableness
inquiry under § 330(a)(1) (the Lodestar factors)"; court went on
to note in a footnote that "because the Lodestar factors
conceptually overlap with the factors discussed in § 330(a)(3),
the recent amendments to § 330(a)(3) will likely have little
effect on the Court's review of chapter 7 Trustee's fees."). *See
also In re DeGroof*, 2008 WL 4560088 (E.D.N.Y., Sept. 29, 2008)
(without mentioning Section 330(a)(7), district court held that
bankruptcy court's reduction of trustee's commission was proper,
as amounts to be awarded pursuant to section 326 and 330 are
entirely discretionary when there is a perceived
disproportionality).

**B.  The Court's Ruling on What New Section 330(a)(7), Combined
with Changes to Section 330(a)(3) Must Mean.**

To determine the meaning of a statute, a court must begin
with the plain meaning of its language. *See  United States v.
Ron Pair Enters.,* 489 U.S. 235, 241 (1989). "Courts properly
assume, absent sufficient indication to the contrary, that
Congress intends the words in its enactments to carry 'their
ordinary, contemporary, common meaning.'" *Pioneer Inv. Servs.
Co. v. Brunswick Assocs. Ltd. Partnership,* 507 U.S. 380, 388

19

(1993) (quoting *Perrin v. United States,* 444 U.S. 37, 42 (1979)).
The fact that a statute is awkward or even ungrammatical, does
not make it *per se* ambiguous. *Lamie v. U.S. Trustee*, 540 U.S.
526, 534 (2004). Nor does surplusage necessarily always produce
ambiguity. *Id*. at 536.

While the wording of Section 330(a)(7) is, without a doubt,
somewhat awkward, this court construes the plain meaning of the
relevant statutory authority as follows:[11]

> 1.  Section 330(a)(7) simply means that bankruptcy
> courts shall, in awarding reasonable compensation to
> trustees (both chapter 7 and chapter 11), use a
> commission-style approach, based on the parameters set forth
> in section 326. Even though, in the case of chapter 11
> trustees, pursuant to the mandate of Section 330(a)(3), such
> things as "time spent on services" and "rates charged for
> such services" **shall** be considered by the court, the
> compensation ultimately awarded shall be in the form of a
> commission (*i.e., a percentage of monies disbursed by the
> trustee to parties in interest*).

> 2.  The omission of "chapter 7 trustee" from Section
> 330(a)(3), from being among those persons with regard to
> whom the court "shall" take into consideration certain
> *Johnson*-type factors, must mean that a chapter 7 trustee's
> fee, calculated under the commission structure set forth in
> Section 326, **shall be permitted to be regarded as the**

---

[11] The court notes that, even were it to find it necessary to
consult the legislative history behind the BAPCPA changes to
Section 330, such legislative history is not instructive. It
merely states that Section 407 of BAPCPA "amends section
330(a)(3) of the Bankruptcy Code to clarify that the provision
applies to examiners, chapter 11 trustees, and professional
persons. This section also amends section 330(a) to add a
provision that requires a court, determining the amount of
reasonable compensation to award the trustee, to treat such
compensation as a commission pursuant to section 326 of the
Bankruptcy Code." H.R. Rep. No. 109-31(I) at 87 (2005).

*reasonable compensation to be paid to him in the chapter 7 case*, and the court *shall not be required to undertake the Johnson-type analysis contemplated in Section 330(a)(3).* Whereas with chapter 11 trustees, Congress has clarified that courts *must* undertake a *Johnson*-type analysis (and award only what is justified as reasonable compensation—up to no more than the Section 326 cap), with chapter 7 trustees, courts may start and end with the cap (*i.e.,* there is no obligation to consider the factors described in Section 330(a)(3)).[12]

3.    Finally, section 330(a)(1) and (a)(2) cannot be ignored.  They still, post-BAPCPA, apply to a chapter 7 trustee, like any other professional person employed in the bankruptcy case.  Section 330(a)(1) provides that "the court *may* award to the trustee . . . reasonable compensation for actual, necessary services" and "reimbursement for actual, necessary expenses" (emphasis added).  Section 330(a)(2) provides that the court, on its own motion, or on motion of a party in interest, may "award compensation that is less than the amount of compensation that is requested."  Because of Section 330(a)(1) and (a)(2), courts still, without a doubt, have discretion to award chapter 7 trustees something less than what is generally requested/expected in a Chapter 7 case (*i.e.,* less than the Section 326 commission structure).  In such a situation, the court can and should consider all surrounding facts and circumstances in deciding whether to award something less than the Section 326 commission.  The court believes the inquiry in such a situation *may* include considering the factors set forth in Section 330(a)(3).  In other words, just because the court *shall* consider these factors in connection with a chapter 11 trustee's fee does not mean that the court *shall not* consider these factors if there is an objection to the statutory commission being paid to a chapter 7 trustee.  However, the facts and circumstances probably ought to more heavily suggest disproportionality or inequitableness of the award, than simply a mechanical application of *Johnson*-type factors might suggest.  To simply mechanically apply the

─────────────

[12] This makes imminent sense, from a policy standpoint. There are hundreds-times more chapter 7 cases in the bankruptcy system than chapter 11 cases where chapter 11 trustees have been appointed.  It certainly could create an administrative burden for courts and trustees if a "reasonableness" inquiry were required in every single "asset" chapter 7 case.

Section 330(a)(3) *Johnson*-type factors to a Chapter 7 trustee, whenever there is an objection to his fees, would ignore the reality that Congress, in BAPCPA, specifically acted to exclude chapter 7 trustees from this mandatory test.

    4.    Finally, at least in this Circuit, in light of *Pro-Snax*, a bankruptcy court should focus heavily on whether the chapter 7 Trustee's services "resulted in an identifiable, tangible, and material benefit to the bankruptcy estate" when a court is presented with an objection to the chapter 7 trustee's fee. *See Andrews & Kurth L.L.P. v. Family Snacks, Inc. (In re Pro-Snax Distributors, Inc.),* 157 F.3d 414, 426 (5th Cir. 1998).

## C.    A Reasonable Commission for The Trustee in the Case at Bar.

Turning to the case at bar, the court finds the Trustee's request for compensation to be reasonable; not disproportionate or inequitable under all the circumstances; and justified in light of the identifiable, tangible, and material benefit to the bankruptcy estate.

The record reveals that the Trustee started out with very little in the way of liquid assets:  $15,000.  In other words, there was a genuine risk of nonpayment of him, his professionals, and the creditors.  The Trustee's only prospect of obtaining liquid assets to pay for the costs of administering the estate and to provide a distribution to creditors, was to assert an alter ego claim against an affiliate of the Debtor (Northwest) and, if successful, he would then be able to attempt to tap the insurance coverage available to the affiliate, to hopefully obtain insurance proceeds to pay the large claims against the Debtor's estate.  But even then, the liability of the Debtor (as

22

the construction contractor on the Colorado Property) was not clear. The damages of the main claimant (Simpson, the Property owner—with an allegedly very defective, yet 95% occupied apartment complex) were not clear. Who should contribute to whom was not clear (there being 40+ parties—all of whom had been resistant to settlement for three-and-one-half years). This was complex, multi-party, and multi-million dollar commercial litigation. This was hardly a "garden variety" chapter 7 liquidation with simple objections to car loan debt or credit card debt or run-of-the mill preference lawsuits. This court believes, based on a day of testimony and other evidence, that the Trustee (as earlier noted, a 29-year veteran of bankruptcy cases) and his counsel were a dose of "reality" that the parties to this litigation needed. This was complex, lengthy litigation in which, clearly, many thousands of dollars of litigation fees had been incurred with little tangible success to show for it. The court does not have any evidence of what the fees incurred by Simpson and the other parties had been to date, but the court can glean from the evidence that the fees have, no doubt, been astronomical—no doubt far more than the $345,000 commission the Trustee is seeking and, no doubt, more than the approximately $150,000 of fees all Trustee's professionals have sought in the aggregate. The court is not basing this on idle speculation. The evidence produced was that more than 100 depositions had

occurred (with 45 more scheduled in the summer of 2007); 34 dispositive motions had been filed and briefed in the Colorado Lawsuit (and most resolved); over 1,700 pleadings had been filed in the Colorado Lawsuit; 62 experts had been retained; and seven days of mediation (prepetition) had occurred. As previously mentioned, only four to six settlements had occurred after three-and-one-half years. Simpson showed the court 38 thick trial notebooks of various work product produced by Simpson and/or its lawyers relative to the litigation (to suggest that they had done far more work in this litigation than the Trustee, and the Trustee was entering into settlements piggy-backing off of Simpson's work). But this argument cuts both ways. The Trustee's "don't-reinvent-the-wheel" approach kept his lawyer's fees down.

The court believes the Trustee and his counsel were a benefit to the litigation and the estate. The court believes that certain parties were losing sight of the forest for the trees. It was time for the litigation to stop. The litigation had driven the key target into bankruptcy. It was time to settle and move on.

Simpson is no doubt disappointed in what it perceives to be a low net recovery in this case. But this court thinks the Trustee earned his fee. The Section 326 statutory commission is reasonable, not disproportionate and not inequitable, given the

24

time and labor involved;[13] novelty and difficulty of the questions;[14] customary fees in similar cases in the community;[15] the contingent versus fixed nature of the fee;[16] time limitations imposed by the circumstances;[17] the amount involved and results obtained;[18] and the experience, reputation and ability of the attorney.[19]

Finally, the court does not believe the Trustee manipulated things in this case to improperly increase his commission. *See Pritchard v. U.S. Trustee*, 153 F.3d 232 (5th Cir. 1998) (trustee's commission could not include unliquidated property transferred to unsecured creditors; chapter 7 trustee's

---

[13] 461.7 hours in 16 months.

[14] Complex commercial litigation involving more than 40 parties and various construction damages, insurance coverage issues, and alter ego theories.

[15] Less than $500,000 of total fees for the Trustee and professionals, in a $10.5 million asset case, is certainly well within the norm.

[16] The Trustee had $15,000 in the bank when he started to work in this case. He was truly working on a contingency fee basis.

[17] The Trustee began work on the second day of the case and worked long hours early in the case on a short time fuse.

[18] $10.5 million of settlements generated during the first sixteen months of the bankruptcy, compared to $1 million of settlements the first three-and-one-half years of the Colorado Lawsuit.

[19] The Trustee enjoys an excellent 29-year reputation as a bankruptcy specialist in this district.

commission is to be based on "moneys disbursed" by the trustee to parties in interest).  The Trustee had a very legitimate reason to insist that insurance policy proceeds be paid to the estate before being paid to Simpson (the Trustee was giving the insurance companies a release of any and all claims; moreover, the estate had a claim to the insurance policy(ies) from which the proceeds were derived, by virtue of an alter ego claim controlled by the Trustee).  Based on the foregoing

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that the Trustee is awarded reasonable compensation of $340,913.11 in fees (calculated using the commission structure in Section 326(a)) and reimbursement of $4,603.12 of expenses, for a total of $345,516.23.

###END OF MEMORANDUM OPINION AND ORDER###